SECRET//REL TO USA, FVEY

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RYAN GOODMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 20 Civ. 8349 (LJL) |
| ) | |
| U.S. DEPARTMENT OF DEFENSE, ) | |
| ) | |
| Defendant. ) | |

## (U) DECLARATION OF DR. THOMAS M. WILLIAMS, PERFORMING THE DUTIES OF THE DEPUTY UNDER SECRETARY OF DEFENSE FOR POLICY

(U) I, Dr. Thomas M. Williams, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief:

1.    (U) Since November 10, 2020, I have been performing the duties of the Deputy Under Secretary of Defense for Policy ("DUSD(P)"). In that capacity, I am a staff assistant and adviser to both the Secretary of Defense and the Deputy Secretary of Defense for all matters concerning the formation of national security and defense policy. I exercise policy development, planning, resource management, fiscal, and program evaluation responsibilities. The mission of the Office of the Under Secretary of Defense for Policy is to consistently provide responsive, forward-thinking, and insightful policy advice and to support the Secretary and the Department of Defense ("DoD") in alignment with national security objectives.[1]

---

[1] Under Secretary of Defense for Policy (USD(P)) Anthony Tata is currently unavailable to provide a declaration in the case because he is traveling outside of the continental United States.

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

2.      (U) Prior to serving in this capacity, I served as the Principal Deputy Assistant Secretary of Defense for Strategy, Plans, and Capabilities.  Prior to that, I served for two years on the National Security Council, most recently as Deputy Assistant to the President and Senior Director for European Affairs.  I hold a bachelor's degree in Foreign Service from Georgetown University and a doctorate in Political Science from Johns Hopkins University.  Prior to government service, I worked at the Center for Naval Analyses' Strategic Initiatives Group and as a Visiting Assistant Professor of Politics at Washington and Lee University.

3.      (U) Pursuant to Section 1.3(a)(2) of Executive Order ("E.O.") 13526, the Deputy Secretary of Defense, acting pursuant to a delegation from the Acting Secretary of Defense, has authorized me to exercise TOP SECRET original classification authority.

4.      (U) My statements herein are based upon my personal experience and knowledge of DoD operations and information, my review of the records responsive to Plaintiff's Freedom of Information Act ("FOIA") requests in this case, information available to me in my capacity as performing the duties of DUSD(P), and information furnished to me in the course of my official duties.

5.      (U) I am familiar with Plaintiff's two FOIA requests submitted on April 22, 2020. The first request, assigned tracking number 20-F-0996, sought "[r]ecords sufficient to show the number of military and DoD Appropriated Fund ('APF') civilian personnel permanently assigned to: Afghanistan, Iraq, and Syria for the period December 2017 to the most recent available quarter, disaggregated by country and broken down quarterly;" "[r]ecords sufficient to show the number of U.S. Armed Forces personnel on temporary duty or deployed in support of

---

I am therefore providing this declaration in his stead, under authority Mr. Tata has delegated to me.

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

contingency operations . . . in reported totals" for each of the three countries over the period

December 2017 to the most recent available quarter;" and "[r]ecords sufficient to show the Force

Management Level ('FML')" for the three countries over the same period.  The second request,

assigned tracking number 20-F-0997, sought "records sufficient to show the criteria for counting

or determining the number of military personnel by country reported in the DMDC quarterly

manpower report;" "sufficient to explain the decision to stop publishing the number of military

personnel assigned to Afghanistan, Iraq, and Syria in DMDC quarterly reports;" "sufficient to

show the criteria for counting or determining the number of personnel under the FML for

Afghanistan, Iraq, and Syria;" and "sufficient to show whether FML continues to function as a

troop cap in Afghanistan, Iraq, and Syria."

6.      (U) The purpose of this declaration is to describe the basis for withholding certain

classified information responsive to the FOIA requests pursuant to FOIA exemption 1, 5 U.S.C.

§ 552(b)(1) ("Exemption 1"), in support of Defendant's Motion for Summary Judgment.

7.      (U) Each paragraph of this declaration has been portion-marked with the level of

classification and control markings necessary for the full protection of the information in that

paragraph.  The marking "U" denotes unclassified information.  The marking "S" denotes

information classified at the SECRET level because I have determined that its unauthorized

disclosure reasonably could be expected to cause serious damage to the national security.  REL

TO USA, FVEY, or "REL" stands for releasable to the five countries with an intelligence

alliance, specifically Australia, Canada, New Zealand, the United Kingdom, and the United

States and means that the information can be disseminated to those persons only and cannot be

disseminated to other foreign nationals.  The overall classification of this declaration reflects the

highest classification level of any individual paragraph.

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

8.    (U) Consistent with the standards established in E.O. 13526 and pursuant to my delegated authority thereunder, I have determined that this declaration is properly classified SECRET//REL TO USA, FVEY and must be transmitted and safeguarded in compliance with the standards for information so classified.   The delivery and storage of this declaration will be coordinated with a Department of Justice Security Officer.

9.    (U) This declaration must be presented to the Court *in camera* because it contains classified information that cannot be publicly disclosed.  My duty under E.O. 13526 to protect classified information includes restricting it from being disseminated to persons who have not received a favorable determination of eligibility for access to classified information, have not signed a non-disclosure agreement, and who have no need to know the information.  This declaration must be presented to the Court *ex parte* because the plaintiff's attorneys have not been determined eligible for access to classified information, nor assessed as having a need to know the classified national security information in this case.  I have determined, based on my knowledge of the facts and circumstances of this case, that the plaintiff's attorneys have no need to know the information contained in this declaration.

### Background on Reporting of U.S. Military Forces in OIR and OFS

10.    (U) On June 10, 2017, Secretary of Defense Mattis approved a proposal by the Joint Staff to make changes to the force management construct—that is, how DoD manages, accounts for, and reports force levels—for Operation Inherent Resolve (OIR) in Iraq and Syria, and Operation Freedom's Sentinel (OFS) in Afghanistan.  Specifically, Secretary Mattis instructed the USD(P) to develop and implement plans to transition the force management construct for OIR and OFS from a Force Management Level (FML) construct to a Baseline Forces and Temporary Enabling Forces (TEF) construct.

4
SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

11.    (U) In accordance with this instruction, USD(P) developed Force Management Implementation Plans for OFS and OIR, which were ultimately submitted to Secretary Mattis in August and September of 2017, respectively, through Action Memos.  The Implementation Plans specified how troop deployments would be categorized; how public affairs would report troop numbers to the press and the public; and how DoD would engage with congressional committees, other U.S. federal agencies, and foreign governments regarding troop numbers in the three countries.

12.    (U) Secretary Mattis approved the Action Memo for the Revised OFS Force Management Construct on August 29, 2017, and the OFS Force Management Implementation Plan on August 30, 2017.  Secretary Mattis approved the Action Memo for the Revised OIR Force Management Construct on September 28, 2017, and the OIR Force Management Implementation Plan on October 7, 2017.  Thereafter, the plans were incorporated in to the Execution Orders (EXORDs) that were issued to the U.S. Central Command (USCENTCOM) for OIR and OFS.

13.    (U) The force management construct previously in place was the Force Management Level (FML).  The methodology for calculating the FML excluded certain personnel who were exempt from Boots-on-the-Ground (BOG) business rules.  For example, the FML excluded specialized military forces focused on retrograde operations (e.g., moving equipment out of Afghanistan) even though those forces were on deployment to Afghanistan.  Combat support agencies also deploy military personnel with specialized skills to Afghanistan; these personnel were previously BOG-exempt and not included in FML.

14.    (U) Under the revised force management construct approved by Secretary Mattis, FML was replaced by Baseline and Temporary Enabling Forces.  In general terms, Baseline

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

forces are conventional forces necessary to carry out the mission.  Under the new construct, certain previously BOG-exempt forces, such as the specialized personnel described in the prior paragraph, are now reported in the Baseline.  Temporary Enabling Forces are those forces required for short-duration missions, to vary based on operational conditions.  TEF personnel conduct relief-in-place/transfer of authority, temporary duty, and short-duration missions not routinely required to support the core mission.

15.    (U) The revised force management construct seeks to increase operational flexibility to counter emergent threats and simplify and improve accounting rules.  In Secretary Mattis's judgment, the methodology for determining FML, which excluded BOG-exempt personnel, did not present a sufficiently accurate or complete picture of the level of troops in Iraq, Syria, or Afghanistan in reporting both to Congress and to the public.  Secretary Mattis also had concerns that public reporting of precise troop figures advantaged the enemy by providing specific information about how many troops we were sending into specific theaters of operation.

16.    (S/REL) (b) (1) (A), (b) (1) (D)



17.    (U) Under the revised force management construct approved by Secretary Mattis, DoD changed the way it reports the number of deployed military personnel to Congress, including in quarterly reports to Congress pursuant to Section 1267 of the National Defense

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

Authorization Act for Fiscal Year 2018 ("Section 1267 Reports").  In the unclassified Section

1267 Report, DoD provides publicly disclosed approximate numbers of U.S. Armed Forces

personnel deployed to Iraq, Syria and Afghanistan, which exclude military personnel whose

deployment is not acknowledged publicly, as detailed in a classified annex.  In the classified

annex, DoD reports the total Baseline and Temporary Enabling Forces, as well as the

presidentially authorized troop level.

18.     (U) To provide the Court with examples, true and correct copies of the Section

1267 Reports for March 2018 and November 2020, including classified annexes, are attached

hereto as Exhibits A and B, respectively.  I understand that the unclassified quarterly reports

from December 2017 to November 2020, and redacted versions of the classified annexes, have

been produced to Plaintiff.

19.     (U) The force management reporting construct adopted in 2017 has important

advantages over the previous construct.  As Secretary Mattis explained in May 2018

correspondence to certain Members of Congress, which I understand have been produced to

Plaintiff, the transition from FML to the revised reporting construct optimizes how DoD

manages, accounts for, and accurately reports force levels consistent with operational security.  It

increases the Department's transparency and consistency by publicly reporting certain previously

undisclosed temporary duty personnel deployed in Afghanistan, Iraq, and Syria without

inhibiting commanders' flexibility to adapt to battlefield conditions.  While precise figures of

deployed military personnel are no longer publicly reported, the publicly disclosed approximate

figures appropriately balance the need for transparency with the need to protect sensitive

information that could advantage the enemy and endanger our personnel.  Congress is provided

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

with a fully detailed accounting of the number of deployed military personnel in classified

reporting that is kept current.

## (U) DoD'S WITHHOLDING OF RESPONSIVE RECORDS AND INFORMATION PURSUANT TO FOIA EXEMPTION 1

20.      (U) As described in the declaration of Mark Herrington, DoD identified the

following records as responsive to Plaintiff's FOIA requests because they are "sufficient to

show" the data and information sought by Plaintiff:  (a) DoD's December 2017 quarterly report

to Congress pursuant to the War Powers Resolution, Pub. L. No. 93-148, and its Section 1267

Reports from March 2018 to November 2020 (collectively, the "Quarterly Reports"), including

the classified annexes; (b) the Action Memos and Force Management Implementation Plans

approved by Secretary Mattis in 2017; (c) responsive sections of the EXORDs for OIR and OFS

pertaining to force management methodology, accounting and reporting; and (d) certain

unclassified data regarding the number of military and civilian personnel permanently assigned

to Afghanistan, Iraq, and Syria.

21.      (U) DoD undertook a declassification review to determine whether the data

requested in items 2 and 3 of Plaintiff's first FOIA request, which is reflected in the classified

annexes to the Quarterly Reports, remains currently and properly classified.  In December 2020,

Acting Secretary of Defense Christopher C. Miller determined that the data remains currently

and properly classified under sections 1.4(a) (military plans or operations) and 1.4(d) (foreign

relations or foreign activities of the United States) of E.O. 13526, and thus exempt from release

pursuant to FOIA Exemption 1, 5 U.S.C. § 552(b)(l).  In accordance with the Acting Secretary's

determination, DoD has withheld certain classified information from the classified annexes to the

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

Quarterly Reports, the Action Memos and Implementation Plans, and the relevant EXORD sections pursuant to Exemption 1.

### (U) Exemption 1

22.     (U) Exemption 1, 5 U.S.C. § 552(b)(l), provides that the FOIA disclosure provisions do not apply to matters that are: (A) specifically authorized under criteria established by an Executive Order to be kept from disclosure in the interests of national defense or foreign policy and (B) are in fact properly classified pursuant to such an Executive Order.

23.     (U) Executive Order (E.O.) 13526 establishes a framework for "classifying" and "safeguarding" national security information, "including information relating to defense against transnational terrorism."  Section 6.1(i) of E.O. 13526 defines "classified national security information" or "classified information" as "information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure and is marked to indicate its classified status when in documentary form."  Section 6.l(cc) of E.O. 13526 defines "national security" as the "national defense or foreign relations of the United States."

24.     (U) Section 1.1(a) of E.O. 13526 provides that information "may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and (4) the original classification authority determines that the unauthorized disclosure of the

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

information reasonably could be expected to result in damage to the national security . . . and the original classification authority is able to identify or describe the damage." All of these conditions have been met with respect to the information DoD has withheld pursuant to Exemption 1.

25.     (U) As noted, DoD has withheld information from the classified annexes to the Quarterly Reports pursuant to Exemption 1. I have personally reviewed this information and determined that it is currently and properly classified under section 1.4(a) of E.O. 13526 (military plans, weapons systems, or operations), as it pertains to military plans and operations in Iraq, Afghanistan, and Syria. The information withheld from the Quarterly Reports is also classified under section 1.4(d) of E.O. 13526 (foreign relations or foreign activities of the U.S.), as it pertains to U.S. military actions abroad and the United States' relations with the governments of Afghanistan, Iraq, and Syria, as well as our allies that have partnered with us in relation to those countries, including member nations of the North Atlantic Treaty Organization (NATO).

26.     (U) DoD has also withheld information from the Action Memos, Implementation Plans, and responsive EXORD sections pursuant to Exemption 1. I have personally reviewed this information and determined that it is currently and properly classified under sections 1.4(a) and 1.4(d) of E.O. 13526. The withheld information pertains to (1) ongoing military plans and operations in Iraq, Syria, and Afghanistan, including specific details and analysis of how troop numbers will be accounted for and reported, as well as locations of special mission forces, and (2) foreign relations and activities of the United States, including foreign relations considerations; engagement plans with the governments of Afghanistan, Iraq, and Syria, as well as allied partners.

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

27.     (U) All of the information that has been withheld pursuant to Exemption 1 is owned by, produced by or for, and/or under the control of the U.S. Government.

### (U) Harms to National Security

28.     (U) I have determined that public disclosure of the classified information withheld pursuant to Exemption 1 could reasonably be expected to result in serious damage to national security.  Such disclosure would result in specific and identifiable harms to DoD's ability to conduct military operations in Iraq, Syria, and Afghanistan and to the foreign relations and foreign activities of the United States, as described below.

29.     (S/REL) (b) (1) (A), (b) (1) (D)



30.     (S/REL) (b) (1) (A), (b) (1) (D)

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

(b) (1) (A), (b) (1) (D)

31.   (S/REL) (b) (1) (A), (b) (1) (D)

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

(b) (1) (A), (b) (1) (D)

32.   (S//REL) (b) (1) (A), (b) (1) (D)

33.   (S//REL) (b) (1) (A), (b) (1) (D)

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY



34.     (U) In processing the classified indexes to the Quarterly Reports for release in redacted form, DoD noted that a few of the reports contain statements about the classification of certain data that is inaccurate and inconsistent with the force management construct approved by Secretary Mattis.  For example, the March 2018 and June 2018 Quarterly Reports state that "the row of figures labeled 'Baseline' . . . is unclassified."  This statement is incorrect, for the reasons discussed above, and the statement was removed from subsequent reports.[2]  Despite these statements, both the Acting Secretary of Defense and I have determined that the precise figures

---



[2] (S//REL) (b) (1) (A), (b) (1) (D)

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

withheld from the classified annexes of the Quarterly Reports, including the Baseline forces, are currently and properly classified. I also note that consistent with the revised force management construct approved by Secretary Mattis, these figures were not disclosed publicly but were reported in classified annexes to the Quarterly Reports.

35.    (U) The presidentially authorized force level, which is reflected in the classified annexes to the 1267 Reports, is also classified and withheld pursuant to Exemption 1. The President has delegated to the Secretary of Defense the authority to set baseline force levels in Iraq, Syria, and Afghanistan. This effectively functions as a troop cap, although the presidentially authorized force level excludes certain categories of military personnel, including TEF personnel conducting relief-in-place/transfer of authority, temporary duty, and short-duration missions.[3]

36.    (U) Disclosure of the presidentially authorized force level could reasonably be expected to harm national security by revealing to adversaries whether and how many additional troops may be available to commanders on the ground, and whether there is flexibility to increase troop levels or barriers to doing so in a particular theater of operations. It would advantage the enemy to know that the level of U.S. forces currently in a particular theater is or is not close to the presidentially authorized force level, such that there may be impediments to increasing the force level, at least in the near term. It could also be strategically advantageous to U.S. forces if the enemy were to believe that U.S. forces may be at or near the cap, if in fact there is flexibility to add additional forces.

---

[3] (U) Plaintiff's second FOIA request seeks records "sufficient to show whether FML continues to function as a troop cap in Afghanistan, Iraq, and Syria," and records "sufficient to show the criteria for counting or determining the number of personnel under the FML for Afghanistan, Iraq, and Syria" for the period December 2017 to the most recent quarter. As noted, the revised force management construct approved by Secretary Mattis did away with FML.

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

37.    (U) In some cases, the information withheld from the classified annexes pursuant to Exemption 1 includes projected personnel totals. These include projected totals of civilian and contractor personnel, although actual totals of civilian and contractor personnel have generally been released. Plaintiff's FOIA requests do not appear to seek projected personnel data. If it is responsive, the projected totals of civilian and contractor personnel are withheld because such projected data provides insight into specific future military plans and operations. Information about projected increases or decreases in civilian or contractor personnel could be used by the enemy to ascertain U.S. military strategy and analyze whether certain events impacted that strategy. For example, if personnel numbers were projected to decrease, but subsequent 1267 Reports demonstrated that the numbers remained static or increased, our adversaries could analyze whether their attacks in the region impacted strategy regarding the level of civilian and contractor personnel deployed to the region.

38.    (U) In his Complaint, Plaintiff alleges that "DoD published U.S. troop numbers through the quarterly report *Worldwide Manpower Distribution by Geographical Area,* and later through [the Defense Manpower Data Center ('DMDC')]," and that "[d]ecades of historical reports are available on the DMDC website." (ECF No. 1 ("Complaint" or "Compl.") ¶ 11.) The DMDC reports located at https://www.dmdc.osd.mil/appj/dwp/dwp_reports.jsp contain information regarding the numbers of troops deployed to Iraq, Afghanistan, and Syria between September 2008 and December 2017. However, as a result of the policy change described above, DMDC no longer publicly reports comparable data.

39.    (U) The fact that historical DMDC reports through December 2017 remain on the website should not be construed as a determination by DoD that public disclosure of precise military personnel figures would not cause harm to national security, but rather reflects an

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

acknowledgment that the information in the historical DMDC reports has previously been officially and publicly disclosed by DoD. As described above, DoD's determination is that reporting of precise figures deployed military personnel in Iraq, Syria and Afghanistan could reasonably be expected to cause serious harm to national security.

40.     (U) The information withheld by DoD pursuant to Exemption 1 has not been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization, or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.

41.     (U) I have reviewed the information withheld by DoD under Exemption 1 to determine whether any additional non-exempt information can be reasonably segregated and released. I have determined that there is no reasonably segregable, non-exempt information among the information withheld by DoD pursuant to Exemption 1.

(U) CONCLUSION

42.     (U) DoD recognizes that the American public has a significant interest in knowing how U.S. government resources are being spent. This is especially true when the costs are not only fiscal but may include the blood and sacrifice of the brave members of the Armed Forces who risk their lives in conflicts overseas. But DoD must also strike a balance between ensuring transparency, on the one hand, and operational and national security, including the protection of military personnel, on the other. To be sure, it can be difficult to determine exactly where to draw the line and how to strike the balance between transparency and security. As Secretary Mattis did in 2017, I have determined that the proper line of demarcation is to permit public release of approximate numbers of deployed military forces, as well as numbers of personnel

SECRET//REL TO USA, FVEY

SECRET//REL TO USA, FVEY

permanently assigned to the region,[4] but to exclude from public reporting military personnel whose deployment is not acknowledged publicly.  At the same time, DoD ensures that Congress, the peoples' representative, is provided with all of the classified information that is not publicly disclosed.

Executed this __11th__ day of January 2021, in Arlington, VA.


DR. THOMAS M. WILLIAMS
PERFORMING THE DUTIES OF THE
DEPUTY UNDER SECRETARY OF
DEFENSE FOR POLICY

---

[4] (U) DoD has not withheld the information responsive to item 1 of Plaintiff's First FOIA Request, *i.e.*, "the number of military and DoD Appropriated Fund ('APF') civilian personnel permanently assigned to: Afghanistan, Iraq, and Syria for the period December 2017 to the most recent available quarter, disaggregated by country and broken down quarterly."

SECRET//REL TO USA, FVEY